## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bky. Case No.: 21-30420 |
| | ) | Chapter 7 |
| Andy Baron Elliott and | ) | |
| Sandra Leah Elliott, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| Gene W. Doeling as Bankruptcy Trustee, | ) | **RESPONSE TO MOTION TO DISMISS** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Andy Baron Elliott and | ) | |
| Sandra Leah Elliott, | ) | |
| | ) | |
| Defendants. | ) | Adversary No. 24-07012 |
| | ) | |

The Trustee commenced the present adversary action, raising two overarching claims against the Debtors. First, the Trustee is seeking a declaratory judgment from the Court that the Debtors converted from Chapter 13 to Chapter 7 in bad faith. Second, the Trustee seeks the denial of the Debtors' discharge under § 727 of the United States Bankruptcy Code. This second claim consists of several subclaims in that the Trustee is seeking to deny the Debtors' discharge under § 727(a)(2)(A); § 727(a)(2)(B); § 727(a)(3); § 727(a)(4); and § 727(a)(6).

The Debtors have brought this Motion to Dismiss the entirety of the Trustee's Adversary Complaint based upon several perceived deficiencies with the pleadings. As with the Debtors' other conduct within this case, the present Motion to Dismiss appears to have been brought in bad faith.

I. <u>LEGAL STANDARD</u>

A Rule 12(b)(6) Motion to Dismiss (made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure) is an attack on the form and substance of the Trustee's Adversary

Complaint. To succeed, "[t]he complaint 'must show the plaintiff is entitled to relief, by alleging sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Du Bois v. Bd. of Regents of the Univ. of Minn., 987 F.3d 1199, 1202 (8th Cir. 2021) (quoting BNSF Ry. Co. v. Seats, Inc., 900 F.3d 545, 546 (8th Cir. 2018)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

At the motion to dismiss stage, the Court must "assume all factual allegations in the complaint are true and . . . make all reasonable inferences in favor of the nonmoving party." Dormani v. Target Corp., 970 F.3d 910, 914 (8th Cir. 2020).

> [D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense. Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Pp. 677-680

Ashcroft v. Iqbal, 556 U.S. 662, 663-64, 129 S.Ct. 1937, 1940-41, 173 L.Ed.2d 868 (2009).

> When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed.R.Civ.P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider "some materials that are part of the public record or do not contradict the complaint," Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir.), cert. denied, 527 U.S. 1039, 119 S.Ct. 2400, 144 L.Ed.2d 799 (1999), as well as materials that are "necessarily embraced by the pleadings." Piper Jaffray Cos. v. National Union Fire Ins. Co., 967 F.Supp. 1148, 1152 (D.Minn. 1997). See also 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure; Civil 2d § 1357, at 299 (1990) (court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint"). The district court therefore properly relied upon a transcript of the proceedings before Judge Davis.

Porous Media Com. v. Pall Corp, 186 F.3d 1077, 1079 (8th Cir. 1999).

As a general rule, the pleading standard is set by Rule 8(a) of the Federal Rules of Civil Procedure (made applicable by Rule 7008(a) of the Federal Rules of Bankruptcy Procedure), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." F.R.Civ.P. 8(a)(2). The purpose of Rule 8(a) is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

The Debtors argue that several of the Trustee's subclaims, specifically those raised under § 727(a)(2) and § 727(a)(4), require that the Trustee comply with the heightened pleading standard for claims of fraud. (Br., p. 11, DE# 4). This question does not appear to have been definitively answered within this jurisdiction. Nevertheless, the Trustee's Complaint complies with the heightened pleading standard which requires that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (made applicable by Rule 7009 of the Federal Rules of Bankruptcy Procedure). "In other words, the party must typically identify the 'who, what, where, when, and how of the alleged fraud.'" BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007) (quoting United States ex rel. Costner v. URS Consultants, Inc., 317 F.3d 883, 888 (8th Cir. 2003)). "[W]hether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded." Ashcroft v. Iqbal, 556 U.S. 662, 673, 129 S.Ct. 1937, 1946, 173 L.Ed.2d 868 (2009). Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. F.R.Civ.P. 9(b).

However, "[t]he level of particularity required depends on, *inter alia*, the nature of the case and the relationship between the parties." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007) (citing Payne v. U.S., 247 F.2d 481, 486 (8th Cir. 1957)).

> Even in the regular administration of Rule 9(b) and the carrying out of its general purpose, it is to be borne in mind that, as stated in 1 Barron and Holtzoff, Federal Practice and Procedure, § 302, p. 593, 'the sufficiency of a pleading must largely depend upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading'.

Payne v. U.S., 247 F.2d 481, 486 (8th Cir. 1957).

In the present matter, the Trustee serves as the representative of the bankruptcy estate. 11 U.S.C. § 323. The facts and details of the underlying actions and transactions that are available to the Trustee are different than those available to a party with direct knowledge of, or dealings with, a defendant. The Trustee must piece together the details of his claims often using only those records provided to him by the Debtors. Accordingly, the Trustee should not be held to the same standards as those of a more direct party. This is especially true in the present case where the Trustee has alleged that the Debtors have withheld pertinent information related to their case.

II.   THE DEBTORS CONVERTED IN BAD FAITH.

The Debtors filed their Chapter 13 bankruptcy petition on September 28, 2021. Compl., ¶ 2, DE # 1. They subsequently converted their case to a Chapter 7 on January 9, 2024. Id. During the pendency of their Chapter 13 case, the Debtors paid just $11,029 into their Chapter 13 plan. Id. at ¶ 18. Under a Chapter 13 bankruptcy, the estate consists of all the debtor's property at the time of filing, as well as all such property that the debtors acquired during the pendency of their Chapter 13 plan. 11 USC § 1306. Upon conversion from a Chapter 13 to a Chapter 7, the bankruptcy estate depends upon whether such conversion was done in "bad faith." Where a case is converted in good faith, the estate consists of only those assets that existed at the time the

original petition was filed and that are still in the possession or control of the debtors as of the

date of conversion. 11 USC § 348(f)(1)(A). In other words, property acquired during the Chapter

13 plan are excluded from the Chapter 7 estate. In contrast, where a case is converted in bad

faith, the estate consists of all of the debtor's property "as of the date of conversion." 11 USC §

348(f)(2). In the present matter, the Debtors acquired substantial assets during the pendency of

their Chapter 13 case, all while paying comparatively little into their Chapter 13 plan and

missing payments to their mortgage holder.

      Before the Court can determine whether a conversion was undertaken in bad faith, the

term must first be defined. Unfortunately, "bad faith" is not defined in the Bankruptcy Code. In

re Lien, 527 B.R. 1, 6 (Bankr. D. Minn. 2015). This leads the Debtors to urge the Court to follow

the lead of its "sister court" (the United States Bankruptcy Court for the Middle District of

Florida) and find that "bad faith should be limited to a situation in which the debtor has

deliberately abused the bankruptcy process . . . ." Br., p. 8, DE # 4 (quoting In re Stillwaggon,

No. 9:10-bk-12289-FMD, 2014 Bankr. LEXIS 1085, at *8-9 (Bankr. M.D. Fla. Mar. 19, 2014)).

It is certainly understandable that the Debtors would advocate for a definition that substantially

narrows the standard adopted by the United States Court of Appeals for the Eighth Circuit which

held: "The bad faith determination focuses on the totality of the circumstances, specifically: (1)

whether the debtor has stated his debts and expenses accurately; (2) whether he has made any

fraudulent representation to mislead the bankruptcy court; or (3) whether he has unfairly

manipulated the bankruptcy code." Molitor v. Eidson (In re Molitor), 76 F.3d 218, 220-21 (8th

Cir. 1996) (citing In re LeMaire, 898 F.2d 1346, 1349 (8th Cir. 1990)).

      The broader definition adopted by the Eighth Circuit reflects the fundamental understanding

that a bankruptcy discharge is a privilege.

A discharge in bankruptcy and the associated fresh start are not fundamental rights. Grogan v. Garner, 498 U.S. at 286, 111 S. Ct. at 659. To the contrary, they are privileges. The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor. Id, 498 U.S. at 286-87, 111 S. Ct. at 659, citing Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S. Ct. 695, 699, 78 L. Ed. 1230 (1934). The cost to the debtor for an unencumbered fresh start is minimal: the debtor must honestly and accurately disclose his or her financial affairs and must cooperate with the trustee.

Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003).

In determining whether the Debtors have operated in bad faith, especially as it pertains to the manipulation of the Bankruptcy Code, the Court should consider:

whether the debtors have been forthcoming regarding the existence of any post-petition change in circumstances that might affect their ability to make payments to their creditors and whether the conversion would create a windfall for the debtors (other than a decrease in liabilities) to which they would not have been entitled but for the existence of their pending Chapter 13 case.

Moser v. Mullican (In re Mullican), 417 B.R. 389, 402 (Bankr. E.D. Tex. 2008). The Court should also consider "the amount of time the Debtor[s] ha[ve] "reposed [themselves] in bankruptcy . . . ." Marshall v. McCarty (In re Marshall), 407 B.R. 359, 362 (B.A.P. 8th Cir. 2009). "Unmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud. *We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.*" Ladika v. IRS (In re Ladika), 215 B.R. 720, 725 (B.A.P. 8th Cir. 1998) (quoting In re LeMaire, 898 F.2d at 1352 n.8) (emphasis in original).

Whether the Debtors acted in good faith or bad must be determined on a case-by-case basis. In re LeMaire, 898 F.2d 1346, 1353 (8th Cir. 1990). The LeMaire Court recognized that "there are no precise formulae or measurement to be deployed in a mechanical good faith equation." Id. "[T]he weight accorded to each factor varies with the circumstances of each case. Id. (citing U.S. v. Estus (In re Estus), 695 F.2d at 311, 317 (8th Cir. 1982)).

The Trustee's Complaint has made sufficient allegations demonstrating the Debtors' efforts to manipulate the Bankruptcy Code. The Debtors filed for Chapter 13 protection on September 28, 2021, with their plan being confirmed on March 28, 2022. Compl., ¶¶ 2, 18, DE # 1. They remained in Chapter 13 until January 9, 2024. Id. at ¶ 2. During that time, the Debtors paid just $11,029 into their Chapter 13 plan. Id. at ¶ 18. By April of 2023, the Debtors were in default under their Chapter 13 plan. Mot. To Dismiss, Case No. 21-30420, DE # 84. This caused the Chapter 13 trustee to bring a Motion to Dismiss, noting that the

> [D]ebtors have failed to maintain payments as outlined in the confirmed plan. To date, the debtors have paid $10,529.00 to the trustee. The current monthly payment is $1,300.00. The last payment was received on 4/3/2023 in the amount of $900.00. The debtors are in default by a total of $2,750.00. This amount is through June and does not include any payments that may come due before the hearing date.

Id. at ¶ 4.

Meanwhile, an astonishing amount of money flowed into and out of the Debtors' pockets. In 2021, prior to the approval of the Chapter 13 plan, Defendant Andy Elliot's tax returns showed gross business receipts of $462,000 in 2021 and $765,000 in 2022. Id. at 8. The Debtors have failed to turn over their 2023 tax returns to allow an analysis of transactions during this period. The Trustee has determined, though, that the Debtors had gross deposits into their First International Bank account of $16,549 in November of 2023; $16,430 in December of 2023; and $107,857 in January of 2024. Id. at 16.

The Debtors' conduct related to their residence is particularly concerning. Their home, located in Watford City, ND, was valued at $370,000 in the Debtors' original schedules, with a scheduled secured claim of $322,835. Id. at ¶ 4. Assuming the accuracy of the Debtors' disclosure, the Debtors entered their Chapter 13 plan with $47,165 in equity in their home. During the pendency of their Chapter 13 plan, the Debtors frequently missed payments on their

mortgage. Benjamin Mann Aff., Case No. 21-30420, DE # 81. Instead, the money that their plan

set aside for their mortgage appeared to have been used by the Debtors on unrelated purchases.

Compl., ¶ 20, DE # 1. This resulted in the continuing accrual of interest against their home loan.

In February of 2024, after converting to Chapter 7, the Debtors took out an additional $73,445.96

HUD loan from Freedom Mortgage and granted a second mortgage against their property. Id. at

6. As of March of 2024, the Debtors claimed that there remained $296,136 owing against their

primary mortgage. Id. at ¶ 5. Effectively, the Debtors liquidated the equity in their home,

allowing them to use the $25,000 exemption in lieu of homestead provided by § 28-22-03.1(1).

In 2022, Defendant Andy Elliot purchased $28,633 worth of tools, despite having spent

$35,360 on tools the year prior. Id. at ¶ 9. In the seven months preceding their conversion, the

Debtors spent at least $14,429.86 on luxury sporting or recreational goods. Id. at ¶¶ 10-11, 14.

Specifically, between June 8, 2023 and December 13, 2023, the Debtors spent $4,940.34 at

sporting goods stores Id. at ¶ 10. The nature of these purchases remains undetermined. The

Debtors claim that a significant portion of these purchases were gunpowder and shells. Id. at ¶¶

20, 24. These are consumable items which, if they have not been depleted, will likely have little

resale value for the estate. Without sufficient records, it is impossible for the Trustee to confirm

whether the Debtors actually purchased what they claim as opposed to more permanent and

saleable assets such as firearms. The Debtors' failure to keep these records will be further

addressed below, but it is indicative of their bad faith in converting.

They spent an additional $3,189.52 in purchases related to an RV or RV accessories. Id.

at ¶ 11. In November of 2023, two months before converting and following, or immediately

preceding, the filing of their proposed amended plan, the Debtors purchased a 2020 Aero AETL

trailer for $6,300. Id. at ¶ 14. On November 2, 2023, the Debtors withdrew $1,500 in cash from

their First International Bank account and a further $5,000 on November 20, 2023. Id. at ¶ 17.

The Debtors have failed to explain where that money went. Id. On December 21, 2023, the

Defendant Andy Elliot transferred $1,100 his daughter and on December 26, 2023, he transferred

$500 to his son. Id. at ¶ 13. These transactions were mere days or weeks before converting to

Chapter 7 based upon their stated inability to make payments under their amended Chapter 13

plan. Id. at ¶ 3.

  The Debtors attempt to spin these transactions by asserting that the "Trustee makes

allegations that, taken as a whole, demonstrate little more than that a couple managed to continue

spending money in an ordinary, family-centric fashion while abiding by the rigors of their

Chapter 13 plan . . . ." Br., p. 9, DE # 4. This does not comport with reality. The Debtors spent

nearly two years paying a mere $11,029 into their Chapter 13 plan while spending substantially

more money on themselves and diverting funds to their family members.

  The Debtors' failure to disclose their purchase of the 2020 Aero AETL trailer presents an

additional indication of bad faith. Compl., ¶14. The same applies to the Debtors' failure to

accurately list the value of their assets. Per the Debtors' tax returns, they spent $35,360 on "small

tools" in 2021 and a further $28,633 in 2022. Id. at ¶ 9. Despite having spent nearly $64,000 in

tools, the Debtors valued them at just $12,000. Id. at ¶ 7. Defendant Andy Elliot admitted to the

Trustee that the tools would likely still appraise for $50,000 to $60,000. Id.

  "When it is discovered that a debtor has attempted to hide an asset, it will generally

support a finding of bad faith." Kaelin v. Bassett (In re Kaelin), 308 F.3d 885, 890 (8th Cir.

2002) (citing In re Doan, 672 F.2d 831, 833 (11th Cir. 1982)). "The efficiency of the bankruptcy

process depends on the accuracy and reliability of the petition, schedules, and statements without

the necessity of digging around or conducting independent examinations to get the true facts.'"

Barrows v. Christians (In re Barrows), 408 B.R. 239, 243 (B.A.P. 8th Cir. 2009) (citing Mertz v.
Rott, 955 F.2d 596, 598 (8th Cir. 1992)).

 The Debtors have engaged in a pattern of behavior demonstrating their lack of good faith.
They have reposed themselves in bankruptcy for two years yet spent more on luxury and
sporting goods in seven months than they paid into their estate during the entirety of their plan.
They transferred assets to family members, failed to disclose purchases, and failed to turn over
records which would have allowed the Trustee to conduct a thorough review of their financial
condition. Under the totality of the circumstances, the Court should find that the Debtors
converted in bad faith.

III. THE DEBTORS' DISCHARGE SHOULD BE DENIED.

 Under § 727 of the Bankruptcy Code, a debtor shall receive a discharge of their debts
unless they engaged in certain enumerated bad acts. This is consistent with the well settled
recognition that a discharge in bankruptcy is a privilege afforded to those who have earned it.

> A discharge in bankruptcy and the associated fresh start are not fundamental rights.
> Grogan v. Garner, 498 U.S. at 286, 111 S. Ct. at 659. To the contrary, they are
> privileges. The opportunity for a completely unencumbered new beginning is
> limited to the honest but unfortunate debtor. Id, 498 U.S. at 286-87, 111 S. Ct. at
> 659, citing Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S. Ct. 695, 699, 78 L.
> Ed. 1230 (1934).

Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003).

 The Debtors remind the Court that a denial of discharge is a harsh remedy. Br., pp. 3, 10,
16, DE # 4. While this is undisputed, the appropriate time to consider whether "a debtor's acts
and omissions may have been inadvertent or otherwise excusable" is after the close of discovery
when the Court has the opportunity to decide on questions of fact. Br. p. 10 (quoting Clippard v.
Jarrett (In re Jarrett), 417 B.R. 896, 901 (Bankr. W.D. Tenn. 2009)).

The Trustee has alleged that the Debtors' actions, in addition to having been a clear indication of their bad faith, were such that their discharge should also be denied. Specifically, the Trustee's claim for denial of discharge under § 727 touches on five subsections: § 727(a)(2)(A); § 727(a)(2)(B); § 727(a)(3); § 727(a)(4); and § 727(a)(6). Each of these will be addressed in turn.

### A.  § 727(a)(2)

The Trustee brings two subclaims under § 727(a)(2). While they are mislabeled in the Complaint, the elements are correct. Section 727(a)(2) provides for the denial of a debtor's discharge where:

> **(2)** the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
> **(A)** property of the debtor, within one year before the date of the filing of the petition; or
> **(B)** property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2).

The primary distinction between the two claims is the timing of the alleged transfers. Section 727(a)(2)(A) applies to transfers made prior to the filing whereas § 727(a)(2)(B) applies to transfers made after filing the petition. While the two subclaims rely on different, though similar, sets of facts, the Debtors combine them together for purposes of their brief. This is largely because the Debtors allege that both of the Trustee's claims fail to meet the heightened pleading requirement for a claim sounding in fraud. For this purpose, the Trustee will respond in the same manner.

The Trustee's § 727(a)(2)(A) claim provides as follows: "The Debtors, with intent to hinder, delay, or defraud a creditor or an officer of the estate, has transferred property of the Debtor within one year before the date of the filing of the Chapter 7 petition, by transferring cash

and a GMC motor vehicle to his children." Compl., ¶ 26, DE # 1. Whereas the § 727(a)(2)(B) alleges:

> The Debtors, with intent to hinder, delay, or defraud a creditor or an officer of the bankruptcy estate, transferred property of the bankruptcy estate after the date of the bankruptcy filing by granting a second mortgage in their real estate, and transferring a motor vehicle to their daughter after the case was converted to a Chapter 7.

Id. at ¶ 27.

The Debtors take issue with these pleadings on the grounds that the Trustee did not meet the heighted pleading requirement of Rule 9(b). This pleading requirement is spelled out in greater detail above, but ultimately requires that the Trustee plead the "'who, what, where, when, and how' of the alleged fraud." Borsheim Builders Supply, Inc. v. Merrick Bank Corp., 387 F. Supp. 957, 963 (D.N.D. 2019). The Trustee has met this burden.

As it relates to the Debtors' transfer of cash to their children, the Trustee has alleged that the Debtors transferred $1,100 to their daughter on December 21, 2023 and $500 to their son on December 26, 2023. Id. at ¶13. As it relates to the transfer of a pickup to the Debtor's daughter, the Trustee has alleged that the pickup was transferred on January 10, 2024, the day after the Debtors converted to Chapter 7. Id. The Trustee also alleged that the Debtors took out a $73,445.96 HUD loan from Freedom Mortgage, secured by a second mortgage on their residence. Id. at ¶ 6. The mortgage was granted by Debtors in February of 2024 after the Debtors had converted to Chapter 7. Id. All of these were done by the Debtors or with their intent to hinder, delay, and defraud creditors. Id. at ¶¶ 26-27.

For each transaction, the Trustee has alleged who made the transfers, who received the transfers, and when the transfers were made. The Trustee also alleged that the transfers were made for the purposes of or with the intent to hinder, delay, or defraud their creditors to personally benefit themselves or their family members. The Trustee is not required to plead the

intent (or the "why") with specificity. It is enough to allege the intent "generally." F.R.Civ.P. 9(b).

The Debtors proffer other explanations for their transfers. They argue that their transfer of the 2004 GMC to their daughter does not demonstrate an intent to hinder, delay or defraud creditors, but instead demonstrates an intent by the Debtors to give their daughter a graduation gift. Br., p. 12-13, DE # 4. This appears to be an attempt by the Debtors to divorce the transaction from its context and to proffer evidence of their intent, an impermissible action at the 12(b)(6) stage. It cannot be ignored that the transfer was made while the Debtors had been in bankruptcy for over two years at the time of the transfer. Nor can it be disregarded that the transfer occurred the day after the Debtors converted to Chapter 7. In any event, this is but one action among many that points towards the Debtors' overall bad faith and malintent.

Likewise, the Debtors profess confusion by the Trustee's claim that the granting of a second mortgage post-conversion is an indicia of bad faith. Id. at p. 12. As noted above, the Trustee claims an interest in the equity of their homestead which, by the Debtors' own estimation, was in excess of $47,000 at the time they filed their Chapter 13 bankruptcy. The Debtors used the automatic stay provided by their initial filing to divert funds set aside for their mortgage payment towards other uses. Mot. Relief, Case No. 21-30420, DE # 34; Benjamin Mann Aff., Case No. 21-30420, DE #81. Following their conversion and their subsequent second mortgage, the Debtors' equity was nonexistent, allowing them to use the $25,000 exemption in lieu of homestead. Obj. to Debtors' Claim of Exemptions, Case No. 21-30420, DE # 154.

In weighing the sufficiency of the pleadings, the Court is not called upon to do so in a vacuum. Instead, the Court must consider "the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much

13

circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." Payne v. U.S., 247 F.2d 481, 486 (8th Cir. 1957).

The Trustee has demonstrated, for purposes of a 12(b)(6) Motion to Dismiss, everything necessary to put the Debtors on notice of the claim. If they allege that they lacked the requisite fraudulent intent, that is a defense to be raised in their response pleading which will need to be proved at trial.

**B.  § 727(a)(3)**

In seeking to deny the Debtors' discharge under § 727(a)(3), the Trustee alleged:

The Debtors have concealed, destroyed, or failed to keep or preserve any recorded information, including books, documents, records and papers from which the Debtors' financial condition might be ascertained. The Debtor has not kept business records and has not provided business records to the trustee reflecting income and expenses which could be used to ascertain Debtor's business condition and transactions. The Debtor claims he spent a significant amount of money on gunpowder, purchased shells, luxury sports items, and did not keep any books, records, receipts, or documents from which his financial condition or business transactions might be ascertained.

Compl., ¶ 24, DE # 1.

The Debtors' contention that the Trustee's §727(a)(3) pleading fails to "adequately state a claim for relief" exposes their lack of good faith in bringing this Motion. As noted above, Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." F.R.Civ.P. 8(a)(2). The purpose of Rule 8(a) is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

The Trustee alleged "The Debtor has not kept business records and has not provided business records to the trustee reflecting income and expenses which could be used to ascertain Debtor's business condition and transactions." Compl. ¶ 24, DE # 1. Further, "[t]he Debtor

14

claims he spent a significant amount of money on gunpowder, purchased shells, luxury sports items, and did not keep any books, records, receipts, or documents from which his financial condition or business transactions might be ascertained." Id. In essence, this is a two part claim. First, the Debtors failed to keep or provide sufficient business records to determine the condition of the Debtors' business(es). Second, the Debtors failed to keep or provide sufficient records from which their financial condition could be determined.

The Debtors deem this to be nothing more than a "threadbare" recitation of the elements of a § 727(a)(3) claim and that the Debtors should not have been expected to keep the records which are the subject of this claim. That the Trustee's allegations mirrors the elements of the claim is neither unusual nor objectionable. The elements are thoroughly fleshed out with detailed factual allegations of the Debtors' failure to keep or maintain their records.

As it relates to the Debtors' failure to keep or maintain business records, the Trustee specifies that Defendant Andy Elliot's tax returns showed gross business receipts of $462,000 in 2021 and $765,000 in 2022. Id. at ¶ 8. The Trustee was also able to determine that the Debtors had gross deposits into their First International Bank account of $16,459 in November of 2023; $16,430 in December of 2023; and $107,857 in January of 2024. Id. at ¶ 16. The Trustee has sought additional records related to the Debtors' business with the Court having issued an Order for Turnover on April 26, 2024. The Order for Turnover required the Debtors to turn over copies of their 2023 federal and state tax returns along with copies of all working papers with the Debtors' 2020, 2021, 2022, and 2023 tax returns. Id. at ¶19. It also required copies of all paperwork including invoices, quotes, and estimates for work Debtor Andy Elliot performed for his business for which he was paid for the period of June 1, 2023 to the current date. Id.

Given that the majority of these documents relate to a period of time after which the Debtors had filed their bankruptcy petition, this understandably puts the Debtors in a position of either acknowledging that they have failed to comply with their duty to maintain business records[1] or that they did maintain these records but are refusing to comply with the Court's April 26 Order for Turnover. Either of these actions are sufficient to support a denial of discharge.

The Debtors also failed to keep or maintain sufficient records of their personal financial condition. In paragraphs 10 and 11 of the Complaint, the Trustee identifies numerous purchases made by the Debtors in the months preceding their conversion to Chapter 7. Id. at ¶¶ 10-11. These purchases, combined with the Debtors' purchase of an AETL trailer, exceed $14,000 which is well above the mere $11,029 the Debtors paid into their Chapter 13 plan. The enumerated purchases are also problematic because of what types of goods may have been purchased by the Debtors. Much of these were purchased at sporting goods stores. The Debtors allege many or most of these purchases were for gunpowder and shells. Id. at ¶ 24. These are consumable goods which may have been used up by the Debtors. However, given the dollar amounts and locations of the purchases, they could have also been undisclosed firearms. If this was the case, those likely remain assets available to the Trustee. The Debtors' failure to maintain records of these large purchases have made it difficult to administer the estate.

To get around the details contained within the Trustee's Complaint, the Debtors have alternatively chosen to "look the other way" or have employed smoke and mirrors to distract from the obvious. As it pertains to the allegations regarding the Debtors' business records, the Debtors unconvincingly argue that "[i]t is not clear what business records are being referenced

---

[1] Detailed below.

by the Trustee . . . ." Br., p. 14, DE # 4. This can be nothing more than a willful attempt to

disregard paragraph 19 of the Trustee's Complaint. In regards to the Trustee's claim that the

Debtors failed to provide sufficient records regarding sporting goods related purchases, such as

gunpowder, shells and luxury sports items, the Debtors are unable to willfully ignore the

enumerated list of purchases and, instead, attempt to spin the allegation to make it appear as

though the Trustee is linking these purchases to the Debtors' businesses. Id. at p. 15 ("But the

enumeration also proves facially problematic, insofar as the Trustee does not allege - and, it

would seem is not likely to allege - that these are business-centric purchases for which persons

would ordinarily keep records."). Whether these purchases were related to the Debtors'

business(es) has yet to be determined, but is not relevant to this Motion. They *do* relate to the

Debtors' financial condition which is all that is necessary.

  The Debtors then shift gears and attempt to argue that the Debtors should not be expected

to maintain the records that are the basis of the Trustee's § 727(a)(3) claim. Id. at p. 15. This is

absurd. It is well settled law that debtors owe a duty to their creditors to keep adequate records of

their financial condition. United States Tr. v. Huynh (In re Huynh), 368 B.R. 838, 843 (Bankr. D.

Minn. 2007) ("Debtors are required to keep adequate financial records to enable parties and the

Court to trace the debtor's financial history, reconstruct financial transactions, and test the

completeness of the disclosure requirements."). Even in a consumer bankruptcy, the debtor has a

greater duty to keep records of "a sudden and large dissipation of assets." Dykes v. Dykes (In re

Dykes), 954 F.3d 1157, 1163 (8th Cir. 2020).

    In short, a prerequisite to the granting of a discharge in bankruptcy is for the
    bankrupt to keep and preserve books and records in an intelligent fashion in order
    to enable the Court to ascertain the debtor's financial history and record. Matter of
    Borron, 29 B.R. 122 (Bkrptcy W.D.MO. 1983); Accord, Broad Nat'l Bank v.
    Kadison, 26 B.R. 1015, 1018 (D.N.J.1983); In re Frank, 14 B.R. 166 (Bkrptcy S.D.
    Fla. 1981). However, "even if the debtor had been keeping appropriate records, his

responsibility did not end there. There inheres in the duty to produce records from which the debtor's financial condition can be ascertained, the duty to take reasonable precautions for the preservation of these records." In re Devine, supra, 11 B.R. at 488; In re Harron, supra, 31 B.R. at 470. Reasonable precautions are determined by the facts and circumstances of each case.

In re Kottwitz, 42 B.R. 566, 569 (Bankr. W.D. Mo. 1984).

The Debtors argue that this duty is limited to "those records that others in like circumstances would ordinarily keep." Br. p. 15, DE # 4 (quoting Miller v. Pulos (in re Pulos), 168 B.R. 682, 692 (Bankr.D.Minn. 1994). In determining what records a similarly-situated debtor might keep, the Court is urged to consider "the debtor's education, sophistication, and business experience, size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances that may exist." Id. However, the specific records which the Trustee has flagged as being problematic relate to numerous and substantial purchases of personal luxury or recreational goods which the Debtors purchased not only while they were in the midst of a Chapter 13 bankruptcy but also in the months immediately preceding their conversion to a Chapter 7.

In any event, these are fact questions which requires the Court to look beyond the pleadings. If the Debtors wish to argue that they should not be expected to maintain these records, the appropriate place to do so is in their responsive pleading.

### C.  § 727(a)(4)

Section 727(a)(4) provides for the denial of a debtor's discharge where:

(4) the debtor knowingly and fraudulently, in or in connection with the case—
(A) made a false oath or account;
(B) presented or used a false claim;
(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

18

11 U.S.C. § 727(a)(4).

The Debtors again assume that the heightened pleading standard of Rule 9 applies to this claim. For purposes of this Response, the Trustee has no need to contest this assertion as the Trustee has plead both the elements of the claim, as well as the factual allegations supporting it, according to the heightened pleading standard of Rule 9(b).

The Trustee has alleged that the Debtor purchased $63,993 worth of tools in 2021 and 2022 while valuing those same tools at just $12,000 in their bankruptcy schedules. Compl., ¶¶ 7, 9, DE # 1. The Debtors later testified at the creditors' meeting that the tools would probably appraise for between $50,000 and $60,000. Id. at ¶ 7. The Trustee also alleged that the Debtors purchased a 2020 Aero AETL trailer for $6,300 in November of 2023 while failing to disclose that same purchase. Id. at ¶14.  While not specifically named in the Complaint, the undisclosed accounts receivables are related to, or otherwise included within, the laundry list of business records which were the subject of the Court's April 26, 2024 Order for Turnover. Specifically, the Debtors were required, by Court Order, to turn over "all of the paperwork, including invoices, quotes, and estimates for work the Debtor performed for his business for which he was paid for the period June 1, 2023 to the current date." Id. at ¶ 19. The Debtors were also required to turnover working papers for their tax returns for the years 2020, 2021, 2022, and 2023. Id.

As with the § 727(a)(2) claim, the sufficiency of the allegations must be considered in relation to the "nature of the case and the relationship between the parties." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007) (citing Payne v. U.S., 247 F.2d 481, 486 (8th Cir. 1957)). Likewise, "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." F.R.Civ.P. 9(b). To the extent the Debtors allege the Trustee's Complaint lacks sufficient particularity, this can be directly attributed to the Debtors' failure to

maintain or otherwise turnover the records on which the Trustee would otherwise rely in drafting

a complaint.

### D.  § 727(a)(6)

Finally, the Debtors argue that the Trustee's claim for denial of discharge under

§ 727(a)(6) has failed to meet even the "short and plain statement" requirement of Rule 8. Br., p.

19-20, DE # 4. Section 727(a)(6) instructs that a debtor's discharge should be allowed where:

> **(6)** the debtor has refused, in the case—
> **(A)** to obey any lawful order of the court, other than an order to respond to a
> material question or to testify;
> **(B)** on the ground of privilege against self-incrimination, to respond to a material
> question approved by the court or to testify, after the debtor has been granted
> immunity with respect to the matter concerning which such privilege was invoked;
> or
> **(C)** on a ground other than the properly invoked privilege against self-
> incrimination, to respond to a material question approved by the court or to testify;

11 U.S.C. § 727(a)(6).

In bringing this claim, the Trustee alleged:

> The Debtors have not complied with the Court's order dated April 26, 2024, in that
> they have not provided copies of working papers for the Debtors' 2020, 2021, 2022,
> and 2023 tax returns, which the Debtor relied on to report his income and expenses
> on his tax returns. The Debtor also did not provide all of the paperwork, including
> invoices, quotes, and estimates for work the Debtor performed for his business for
> which he was paid for the period June 1, 2023 to the current date. Pursuant to 11
> U.S.C. § 727(a)(6), the Debtors have refused to obey any lawful order of the court,
> and their discharges should be denied.

Compl., ¶ 28, DE # 1.

In arguing against the sufficiency of this claim, the Debtors absurdly state, without

citation to relevant authority, that the Trustee is required to allege that they had an "ability to

comply" with the Order. Br., p. 20, DE # 4. This disregards the plain language of the statute. The

United States Bankruptcy Court for the Northern District of Ohio has noted that there exists a

distinction between a "refusal" and an "inability to comply." <u>Hunter v. Magack (In re Magack)</u>,

20

247 B.R. 406, 410 (Bankr. N.D. Ohio 1999) ("Section 727(a)(6) requires a refusal by the debtor

to obey an order of the court. An inability to comply is not a refusal."). To the extent that the

word "refusal" is not defined in the Bankruptcy Code, the Court may find persuasive the Virginia

Supreme Court's exceptional analysis of the "ordinary and accepted meaning" of the word.

> Since the policy does not define the term "refuse," we give the word its "ordinary
> and accepted meaning." Scottsdale Ins. Co. v. Glick, 240 Va. 283, 288, 397 S.E.2d
> 105, 108 (1990). The verb "refuse" is defined as a "positive unwillingness to do or
> comply with" something demanded or expected. Webster's Third New International
> Dictionary 1910 (1993). A "refusal" is "the denial or rejection of something offered
> or demanded." Black's Law Dictionary 1285 (7th ed. 1999). These definitions
> denote an element of intent, manifested by a volitional act. See Meeks v. Stevens,
> 301 Ark. 464, 785 S.W.2d 18, 20 (Ark. 1990) (noting that definitions of term
> "'refuse' stress the active element of refusal[,] . . . expressing . . . a determination
> not to do a particular thing"); Nebraska v. Medina, 227 Neb. 736, 419 N.W.2d 864,
> 867 (Neb. 1988) ("'To refuse[]' . . . requires that a person understand what is being
> asked of him and then in some way manifest nonacceptance, nonconsent, or
> unwillingness.").
>
> By comparison, to "fail" to do some act denotes a deficiency; and a "failure" is "an
> omission of an expected action . . . or performance[,]" Black's Law Dictionary 613,
> or the neglect of an assigned or expected action, Webster's Third New International
> Dictionary 815. See Laubach v. Franklin Square Hosp., 79 Md. App. 203, 556 A.2d
> 682, 690 n.11 (Md. Ct. Spec. App. 1989), [***10] aff'd, 318 Md. 615, 569 A.2d
> 693 (1990) (distinguishing "failed" from "refused" on basis that "refused" "involves
> an act of the will," while "failed" may be "an act of inevitable necessity") (quoting
> Black's Law Dictionary 1152-53 (5th ed. 1979)).

Craig v. Dye, 526 S.E.2d 9, 12 (Va. 2000).

In other words, the Trustee has no need to allege that the Debtors have the relevant

documents in their possession or control. The simple claim that they have "refused" to comply

with the Court's Order inherently implies as much.

That said, if the Debtors' ultimately contend that they are unable to comply with the

Court's April 26 Order for Turnover, they may raise it as a defense in their responsive pleading.

The Trustee has met the pleading requirement of 727(a)(6), and the Debtors now carry the

burden of raising and proving the defense of inability to comply. This is beyond the scope of the

Debtors' 12(b)(6) Motion, though given the Debtors' duty to maintain adequate records under

727(a)(3), such a defense would undoubtedly hurt their defenses to the 727(a)(3) claim.

<u>CONCLUSION</u>

As a result of the above, the Trustee respectfully requests that the Court deny the

Debtors' Motion to Dismiss.

Dated this 30th day of September, 2024.

*/s/ Gene W. Doeling*
Gene W. Doeling (05078)
Asa K. Burck (07251)
KALER DOELING PLLP
Attorneys for Plaintiff
PO Box 9231
Fargo, ND  58106-9231
(701) 232-8757